IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| BRANDON WOODRUFF,        ) | |
|        Petitioner,        ) | |
| vs.        ) | No. 3:15-CV-1832-M-BH |
|        ) | |
| LORIE DAVIS,[1] Director,        ) | Referred to U.S. Magistrate Judge |
| Texas Department of Criminal        ) | |
| Justice, Correctional Institutions Division,        ) | |
|        Respondent.        ) | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION**

Pursuant to *Special Order 3-251*, this habeas case has been referred for findings, conclusions, and recommendation. Based on the relevant findings and applicable law, the petition for writ of habeas corpus under 28 U.S.C. § 2254 should be **DENIED** with prejudice.

## I. BACKGROUND

Brandon Woodruff (Petitioner) challenges his conviction for capital murder. The respondent is Lorie Davis, Director of TDCJ-CID (Respondent).

### A.     Pretrial Proceedings

On November 19, 2005, the State indicted Petitioner for capital murder in Cause No. 23,319. (Doc. 8-1 at 49.)[2] It waived the death penalty. (Doc. 10-12 at 5.)

#### 1.     *September 4, 2007 Hearing*

On August 29, 2007, Petitioner filed a motion to dismiss the indictment with prejudice based on alleged prosecutorial misconduct. (Doc. 8-10 at 117.) He contended that the Hunt County

---

[1] Lorie Davis succeeded William Stephens as Director of the Correctional Institutions Division of the Texas Department of Criminal Justice. Under Rule 25(d) of the Federal Rules of Civil Procedure, she "is automatically substituted as a party."

[2] Page citations refer to the CM/ECF system page number at the top of each page rather than the page numbers at the bottom of each filing.

District Attorney's Office (DA's Office) and Hunt County Sheriff's Department recorded telephone conversations between him and his defense team while he was in jail. (*Id.* at 117-18.) Petitioner was provided with a copy of the recordings on July 12, 2007. (*Id.* at 118.) He also filed a motion to disqualify the DA's Office based on the prosecutorial misconduct. (*Id.* at 131.)

At a hearing on September 4, 2007, the Chief Jailer for the Hunt County Sheriff's Department, Curtis Neel, testified that all inmate phone calls are recorded, including attorney-client calls. (Doc. 10-5 at 9.) At the beginning of a phone call, the jail phone system warns the caller and the recipient that the conversation is being recorded. (*Id.* at 21, 31.) One of the prosecutors instructed him to monitor Petitioner's phone calls, but he did not monitor them all. (*Id.* at 10, 14-15.) He monitored Petitioner's phone calls from 2005 until about February 2006, and after May 2007. (*Id.* at 27-28.) Neel saved the monitored recordings on a computer, but the recording machine had automatically taped over the unmonitored recordings. (*Id.* at 15-16.) He listened to phone conversations between Petitioner and members of the defense team. (*Id.* at 17-18.) Neel gave copies of the recordings that he monitored and saved to the DA's Office. (*Id.* at 13.)

Texas Ranger Jeffery Collins testified that he asked for copies of Petitioner's recorded phone conversations from January 2006 to February 2006, which Neel provided. (*Id.* at 43.) He received recordings of approximately 150 phone calls. (*Id.* at 44.) At the request of one of the prosecutors, Ranger Collins gave the recordings to the DA's Office in July or August 2007. (*Id.* at 44-45.) Ranger Collins listened to about 8 or 10 of the phone calls, one of which was from Petitioner to his attorney. (*Id.* at 46-47.) He took notes regarding those calls in 2006, but he threw them away because they were of no value to him. (*Id.* at 48-49.)

In April or May 2007, Hunt County Sheriff's Department investigator Joel Gibson received

recordings of Petitioner's phone calls from November 2 through 23, 2005, which he gave to the DA's Office. (*Id*. at 51.) In total, there were about 50 hours of recorded conversations. (Doc. 10-6 at 13-14.)

The court denied the request to question the prosecutor who had instructed Neel to monitor Petitioner's phone calls. (Doc. 10-5 at 39.) It also denied the motion to dismiss, but indicated that there might be some suppression rulings later. (*Id*. at 70.) It held that witnesses at trial could be asked whether they heard any of the recordings of Petitioner and his attorney. (*Id*. at 39.) A different prosecutor informed the court that none of the witnesses listened to phone calls between Petitioner and members of the defense team. (*Id*. at 40.) The court ordered the DA's Office not to allow anyone to listen to those conversations in the future. (*Id*. at 40-41.) It also ordered that recordings of Petitioner's phone calls would no longer be saved on a computer, and that there would be no future monitoring of his calls to the defense team. (*Id*. at 80-81.) The court reserved a ruling on the motion to disqualify the DA's Office. (*Id*. at 71.)

### 2.     *September 11, 2007 Pretrial Hearing*

At a pretrial hearing on September 11, 2007, Petitioner again sought to question the prosecutor who asked that Petitioner's calls be monitored. (Doc. 10-6 at 12.) Defense counsel expressed concerns about whether the prosecutors learned about defense witnesses or trial strategy through the recordings. (*Id*. at 13.)

The court listened to three hours of recordings and did not hear anything of value. (*Id*. at 16.) It entered an order denying the motion to dismiss and the motion to disqualify the DA's Office. (Doc. 8-11 at 97.) It found that at the beginning of a jail inmate's phone call, the caller and recipient are advised that the conversation is subject to being recorded. It also found that Petitioner's Sixth

3

Amendment right was violated by the State's conduct in listening to his phone conversations with the defense team, but Petitioner and the defense team were aware that inmates' phone conversations were recorded. The court found that the DA's Office did not act with malice in listening to the phone conversations between Petitioner and the defense team because they had some case authority to support their actions. It concluded that dismissal of the case and disqualification of the DA's Office were not appropriate remedies. It suppressed any evidence obtained from the phone conversations between Petitioner and the defense team or as a result of any investigation stemming from information obtained from the phone conversations. (*Id*. at 97-99.)

The DA's Office moved to be recused from the case and for the appointment of a special prosecutor in light of the finding that there had been a Sixth Amendment violation. (*Id*. at 90.) The court granted the motion and appointed an Assistant Texas Attorney General or other person designated by the Texas Attorney General as special prosecutor. (*Id*. at 103; doc. 10-9 at 4.) The DA's Office would remain on the case during the determination of certain pretrial motions. (Doc. 10-9 at 4.) The special prosecutor was ordered not to have contact with the DA's Office concerning the case. (Doc. 8-11 at 103; doc. 10-9 at 4.)

The court also found that the recordings still needed to be transcribed so it could determine what evidence should be suppressed. (Doc. 10-9 at 6.) A visiting judge was temporarily appointed to address the suppression issue and ensure that any suppressed evidence was not transmitted from the DA's Office to the Attorney General. (Doc. 8-11 at 107-08.)

### 3.     *May 8, 2008 Hearing*

Petitioner filed a motion to require the DA's Office to disclose information learned as a result of the Sixth Amendment violation. (*Id*. at 110.) He sought the notes and e-mails of the DA's Office

4

regarding the recordings. (Doc. 10-11. at 1, p. 4.) The visiting judge conducted a hearing on the motion on May 8, 2008. (Doc. 10-11.) In response to the State's argument that the material was protected by the work-product privilege, Petitioner argued the crime-fraud exception to that privilege. (*Id*. at 2, p. 6-7.) He asked the visiting judge to conduct an *in camera* review of the State's file, to which the State agreed, (*id*. at 4, p. 13, at 5, p. 20), and the visiting judge ordered an *in camera* review, (doc. 8-12 at 38). Petitioner again sought to question the prosecutor about the matter. The visiting judge only heard argument and did not hear from witnesses at that hearing. (Doc. 10-11 at 1, p. 4 – 2, p. 5.)

4.  *July 11, 2008 Hearing*

Petitioner also filed a motion to suppress any evidence or further investigation based on information from the recordings. (Doc. 8-12 at 44.) At a hearing on July 11, 2008, Morgan Lee, a State's witness, testified that she had been in a prosecutor's office for an interview approximately one year earlier, and the prosecutor had played about eight to ten minutes of a recording of a conversation between Petitioner and his grandmother. Hearing the recording did not affect her ability to be a truthful witness. (Doc. 10-12 at 24-29.) Her mother was in an adjacent room or hall and overheard the recording, but did not listen to what was said on it. (*Id*. at 15-21.)

The visiting judge denied Petitioner's motion to require disclosure of information and to suppress, and entered findings. (Doc. 8-12 at 153.) The visiting judge noted that the recordings had been previously suppressed. The visiting judge read the transcripts of the calls and reviewed the State's file *in camera*. He found that there was no information or evidence learned or obtained by the DA's Office as a result of the recordings, the State did not initiate any investigation based upon the recordings, and there was no additional evidence to suppress. He found that the DA's Office's

5

notes and any other communications sought by Petitioner were privileged work product and were not subject to disclosure. (*Id*. at 153-54.)

**B.    Trial**

Petitioner pleaded not guilty and was tried before a jury in the 354th Judicial District Court of Hunt County, Texas, on March 4-20, 2009. (Doc. 8-1 at 32-3.) The state appellate court summarized the evidence at trial as follows. *See Woodruff*, 330 S.W.3d at 714-22.

Petitioner's parents had spoken with Petitioner's grandmother by telephone at 9 p.m. Petitioner's sister called them at 11 p.m., but got no answer. Police went to their house in Royce City the next day and found them dead on a couch. Petitioner's mother had five gunshot wounds and a stab wound, while his father had one gunshot wound and nine stab wounds. The bullets were large caliber. There was no forced entry, no signs of a struggle, and the house had not been ransacked. Their wallets were missing, but other valuables had not been taken. A trail of blood drops led to the guest bedroom and bathroom, where very dark hair with light roots was found in the bathtub. At the time of the murder, Petitioner's hair was dark, but his natural hair color was blond.

Petitioner was living at a university in a dormitory room but was at his parents' Royce City house on the night of the murders. He left their house and went to another house they owned in Heath that was approximately 23 minutes away. A neighbor placed him at the Heath house at some time between 10:15 and 10:45 p.m. His parents were in the process of moving from Heath to Royce City, and many of their belongings were still in the Heath house. Cell phone records showed he passed Lake Ray Hubbard on his way to Dallas at around 10:45 p.m.

Petitioner was supposed to meet a friend named Robert Martinez in Dallas at 6 p.m. that evening. Martinez called him several times that evening, and Petitioner was breathing heavily

during one of the conversations. Petitioner met with Martinez later than expected but suggested that Martinez should remember that they met at 9:30 p.m. Although Martinez claimed for three and a half years that they met at 9:30 p.m., he admitted that he did not know what time they met. When Petitioner arrived, he claimed he had gotten lost. He was not wearing a shirt or shoes, which was the first time Martinez had seen him without a shirt or shoes. Another witness testified that Petitioner did not wear a shirt or shoes when riding horses. Petitioner and Martinez met Petitioner's boyfriend, and the group went to a bar.

Petitioner told the police where he was on the night of the murders, but he lied about the timing. He also lied in an interview to a television news station, saying he left the Royce City house at around 7:30 p.m. and had gone to the Heath house, where it took him about 30-45 minutes to feed his parents' animals.

The day before the murders, Petitioner and Morgan Lee, his girlfriend, went to her parents' house and took showers. Petitioner showered next to a room where an old Western-style revolver and bullets were kept. Shortly after the murders, Lee's parents discovered that the revolver was missing, and several bullet loops on a holster had been torn and the large caliber bullets removed. While Petitioner was in jail, he asked another inmate how long a gun with a wooden handle would stay submerged and whether it would float.

Before the murders, Petitioner kept a dagger in his college dormitory room. The dagger was not in his room when police searched it after the murders. Petitioner's aunt found the dagger in the barn at the Heath house two and a half years after the murders. A spot of Petitioner's father's blood was on the knife's guard. A State expert testified that the dagger was consistent with the stab wounds. A defense expert testified that the dagger could not have caused the wounds based on the

7

length of the knife and the depth of the wounds.

On several occasions before the murders, Petitioner told college friends that he was going to see his parents, who were going to give him a new truck. When he failed to return to college with a new truck, he told his friends that his father did not want him to take the truck to college. On the morning after the murders, Petitioner returned to college with his mother's truck. He told the news station that he had permission to drive the truck, and that he normally drove it. He told the police that he was driving the truck because his truck had broken down, but his truck did not appear to have any mechanical problems. His sister did not believe that their mother would have allowed Petitioner to take her truck to college.

The State suggested several possible motives for the murder. When Petitioner was arrested, he had his parents' debit card. Petitioner had reached the credit limit on his own two credit cards. There was tension between Petitioner and his father over his spending habits. They argued about a college tuition refund that Petitioner spent, which belonged to his father. However, Petitioner was receiving payments on a horse he had sold, he had received $15,000 for a horse that died, and he had earned several thousand dollars for modeling. Petitioner's parents had a life insurance policy, but there is no evidence in the appellate record of the amount of the policy. Some of Petitioner's friends had the impression that his parents were wealthy because of his lavish spending habits. His parents were moving from Heath to Royce City to decrease expenses, however, because they were almost $300,000 in debt.

Petitioner had academic problems at college. His parents told him they would not pay for any additional college expenses if he did not do well in his first semester. On the weekend of the murders, Petitioner told his parents that he was attracted to men. Although his father was

disappointed, sad, and hurt, there was no evidence that they threatened to disown him.

When Petitioner was told of his parents' death, but before learning the details of their death, he speculated to this roommate that their death was not an accident. When Petitioner was having his hair dyed for the funeral, he talked about his modeling activities and money.

The jury convicted Petitioner, and he received a life sentence without parole.

### C. Post-conviction Proceedings

The judgment was affirmed on appeal. *Woodruff*, 330 S.W.3d 709. His petition for discretionary review was refused. *Woodruff v. State*, PD-1807-10 (Tex. Crim. App. June 1, 2011). His petition for writ of certiorari was denied on October 31, 2011. *Woodruff v. Texas*, 132 S.Ct. 502 (2011). He did not file a state habeas application. He filed a motion for DNA testing on November 8, 2011, and he filed a second motion for DNA testing on October 25, 2011, which was still pending when he filed his federal habeas petition. (Doc. 1 at 4; doc. 13 at 10 n.6.)

### D. Substantive Claims

Petitioner's habeas petition, filed by counsel on May 27, 2015, raises the following grounds:

(1) The Texas courts erroneously refused to dismiss the indictment when the State intentionally violated Petitioner's attorney-client privilege;

(2) Assuming for the sake of argument Petitioner must prove prejudice when the State intentionally violated the attorney-client privilege, the Texas courts improperly permitted the prosecutor to invoke the attorney work product privilege.

(Doc. 1 at 6, 9.) Respondent filed a response to the petition on August 11, 2015. (Doc. 13.) Petitioner filed a reply on September 10, 2015. (Doc. 15.)

## II. APPLICABLE LAW

Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. 104-132, 110 Stat. 1217, on April 24, 1996. Title I of the Act applies to all federal petitions for

habeas corpus filed on or after its effective date. *Lindh v. Murphy*, 521 U.S. 320, 326 (1997). Because Petitioner filed his petition after its effective date, the Act applies.

Title I of AEDPA substantially changed the way federal courts handle habeas corpus actions. Under 28 U.S.C. § 2254(d), as amended by AEDPA, a state prisoner may not obtain relief

> with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

"In the context of federal habeas proceedings, a resolution (or adjudication) on the merits is a term of art that refers to whether a court's disposition of the case was substantive, as opposed to procedural." *Miller v. Johnson*, 200 F.3d 274, 281 (5th Cir. 2000).

Section 2254(d)(1) concerns pure questions of law and mixed questions of law and fact. *Martin v. Cain*, 246 F.3d 471, 475 (5th Cir. 2001). A decision is contrary to clearly established federal law within the meaning of § 2254(d)(1) "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). As for the "unreasonable application" standard, a writ must issue "if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413; *accord Penry v. Johnson*, 532 U.S. 782, 792 (2001). Likewise, a state court unreasonably applies Supreme Court precedent if it "unreasonably extends a legal principle from [Supreme Court] precedent to a new

10

context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529 U.S. at 407. "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409; accord *Penry*, 532 U.S. at 793.

Section 2254(d)(2) concerns questions of fact. *Moore v. Johnson*, 225 F.3d 495, 501 (5th Cir. 2000). Under § 2254(d)(2), federal courts "give deference to the state court's findings unless they were 'based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.'" *Chambers v. Johnson*, 218 F.3d 360, 363 (5th Cir. 2000). The resolution of factual issues by the state court is presumptively correct and will not be disturbed unless the state prisoner rebuts the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

### III. SIXTH AMENDMENT

Petitioner contends that the State violated his Sixth Amendment rights by recording his jail telephone conversations with his attorney and other members of the defense team.

The Sixth Amendment to the United States Constitution provides in relevant part that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. An attorney-client communication is protected under the Sixth Amendment "if it is intended to remain confidential and was made under such circumstances that it was reasonably expected and understood to be confidential." *United States v. Nelson*, 732 F.3d 504, 518 (5th Cir. 2013) (citing *United States v. Melvin,* 650 F.2d 641, 645 (5th Cir. 1981)).

**A.** **State Court Findings**

The trial court held that Petitioner's Sixth Amendment right to counsel was violated by the

recordings of his conversations with counsel and the defense team. *See Woodruff*, 330 S.W.3d at 723, 724. On appeal, the State did not challenge the trial court's conclusion that Petitioner's Sixth Amendment right to counsel was violated. *Id*. at 723.

The state appellate court set out the standard for determining the appropriate remedy for the Sixth Amendment violation at issue:

> Both the United States Supreme Court and the Texas Court of Criminal Appeals have noted that dismissal may be the appropriate remedy for certain violations of the Sixth Amendment right to counsel. *United States v. Morrison*, 449 U.S. 361, 365–66, 101 S.Ct. 665, 66 L.Ed.2d 564 (1981); *State v. Frye*, 897 S.W.2d 324, 330 (Tex. Crim. App. 1995). However, both courts have also cautioned that dismissal is appropriate only when the suppression of evidence is insufficient to purge the taint of the violation. The United States Supreme Court has stated, "absent demonstrable prejudice, or substantial threat thereof, dismissal of the indictment is plainly inappropriate." *Morrison*, 449 U.S. at 365, 101 S.Ct. 665. The Texas Court of Criminal Appeals has held:
>
>> When confronted with a Sixth Amendment violation, a trial court must, "identify and then neutralize the taint by tailoring relief appropriate in the circumstances to assure the defendant effective assistance of counsel and a fair trial." *Morrison*, 449 U.S. at 365, 101 S.Ct. 665 .... The Supreme Court stated that suppressing evidence and limiting cross-examination are the preferred methods for neutralizing the effects of right to counsel violations.
>
> *Frye*, 897 S.W.2d at 330 (quoting *Morrison*, 449 U.S. at 365, 101 S.Ct. 665). Dismissal of an indictment is "a drastic measure only to be used in the most extraordinary circumstances." *Id*.; *see State v. Mungia*, 119 S.W.3d 814, 817 (Tex. Crim. App. 2003) (trial court erred in dismissing indictment without constitutional violation).

*Woodruff*, 330 S.W.3d at 724-26. It stated that Petitioner had the burden to show prejudice or a substantial threat thereof. *Id*. at 725 (citing *Murphy v. State*, 112 S.W.3d 592, 603 (Tex. Crim. App. 2003)). "Prejudice can be demonstrated either when the State obtains information which leads to admissible evidence against the accused or obtains any information that would only give the State a tactical advantage." *Id*. at 725 (citing *Weatherford v. Bursey*, 429 U.S. 545, 558

12

(1977)).  It also noted that a split among federal courts concerning whether there is a rebuttable presumption of prejudice.  *Id*.

The appellate court reviewed the recordings and found that although the recordings contained some information, the information was not even marginally valuable.  *Id*.[3]  It found that the record did not show that the police or the prosecutor obtained any useful information from the recordings.  *Id*. at 726.  It stated that:

> [i]t was apparent that the defense attorneys suspected that the telephone calls were being recorded. ... Although the recording of the telephone calls might have chilled effective communication over the telephone, the record does not indicate Brandon could not effectively communicate with his counsel through other means.  The recorded conversations do not reveal anything that would be useful to the State.  While there may be a theoretical threat of prejudice, there is not a substantial threat of prejudice.  Because Brandon has failed to show demonstrable prejudice or a substantial threat thereof, the trial court did not err in refusing to dismiss the case.  *See Arroyo v. State*, 259 S.W.3d 831, 834 (Tex. App.-Tyler 2008, *pet. ref'd*) (dismissal not required where no information was elicited from

---

[3]  Approximately 165 telephone calls were recorded, including both privileged and nonprivileged calls. Approximately fifty-four of the calls were made to Brandon's defense counsel or his office staff. The following is a summary of the recorded privileged telephone calls. Most of the calls discuss irrelevant information such as relatives providing Brandon with money, clothes Brandon is going to wear for court appearances, other inmates, and lockdowns. A number of calls contain discussions about where witnesses live and attempts to track down the telephone numbers of witnesses. On Exhibit 1B, the defense counsel's secretary and Brandon discuss how Etherington lied in his statement to the police. On Exhibit 1E, track 5, the defense counsel's secretary and Brandon mention they can prove why he did not have shoes on the night of the murder without providing any details. On Exhibit 1L, track 6, Brandon and the attorney's secretary discuss that one of the profilers used to date his sister. On Exhibit 1M, track 5, they talk about Mike Lee. On Exhibit 1P, track 1, the attorney's secretary asks Brandon what truck he drove to the Heath house and Brandon informs her he drove his truck to the Heath house and then drove Norma's truck to Abilene.

... The State's attorney who reviewed the tapes took forty-three pages of notes.

... It was apparent that the defense attorneys suspected that the telephone calls were being recorded. The defense attorney's office frequently reminded Brandon the telephone calls might be recorded and on a few occasions declined to discuss certain topics with Brandon over the telephone. In fact, on Exhibit 1F, track 5, the defense attorney informs Brandon that the district attorney's office has recorded attorney-client telephone calls in another case. On Exhibit 1L, track 5, the defense counsel's secretary mentions that she has been listening to the recordings. Certain matters were referred to by references so vague that the references could not be deciphered.

*Woodruff v. State*, 330 S.W.3d 709, 725-26 (Tex. App.–Texarkana 2010).

defendant).

*Woodruff*, 330 S.W.3d at 726.

**B.     Standard of Review**

Petitioner contends that the state appellate court should have conducted a harmless error review under *Chapman v. California*, 366 U.S. 18, 24 (1967), which provides that the State must prove beyond a reasonable doubt that the constitutional error did not contribute to the conviction. (Doc. 1-1 at 16-18.) He notes that in *United States v. Morrison*, 449 U.S. 361, 365 (1981), cited by the state appellate court, the Supreme Court held that "absent demonstrable prejudice or substantial threat thereof, dismissal of the indictment is plainly inappropriate even though the violation may have been deliberate." He argues that *Morrison* did not address which party has the burden of proof regarding prejudice or lack of prejudice, and that some courts have held that prejudice should be presumed when there is government interference with Sixth Amendment rights. *See, e.g., Shillinger v. Haworth*, 70 F.3d 1132 (10th Cir. 1995) (presumption of prejudice when the State purposefully intrudes into the attorney-client relationship and becomes aware of confidential communications); *Biggs v. Goodwin*, 698 F.2d 486 (D.C. Cir. 1983) (rebuttable presumption of prejudice). He argues that the state appellate court should have presumed prejudice.

In *Morrison,* the Supreme Court "assumed that a pretrial unsuccessful attempt by government agents to deprive a defendant of her right to effective assistance of counsel was a violation of the Sixth Amendment." *Rushen v. Spain*, 464 U.S. 114, 128 n.7 (1983) (Brennan, J., concurring). Acknowledging "the necessity for preserving society's interest in the administration of criminal justice," the court explained that "[c]ases involving Sixth Amendment deprivations were subject to the general rule that remedies should be tailored to the injury suffered from the

14

constitutional violation and should not unnecessarily infringe on competing interests." *Morrison*, 449 U.S. at 364. Accordingly, "absent demonstrable prejudice, or substantial threat thereof," an indictment should not be dismissed on the basis of a Sixth Amendment violation. *Id*. at 365. Rather, the remedy was to suppress evidence or information obtained from the constitutional violation. *Id*. at 366.

In his concurring opinion in *Rushen*, Justice Brennan noted that *Morrison* was "not a harmless error case." 464 U.S. at 128 n.7. It had observed that if the government obtained incriminating evidence or information as a result of a Sixth Amendment violation, the proper remedy was the suppression of the tainted evidence. *Id*. If that tainted evidence was erroneously admitted, *then* the erroneous introduction of that evidence would be susceptible to a harmless error analysis on appeal, "as the opinion indicated when it then noted in passing that 'certain' violations of the right to counsel may be disregarded as harmless error." *Id*.

As explained by Justice Brennan in *Rushen*, and contrary to Petitioner's argument, a harmless error analysis on appeal under *Chapman* is required only if the trial court did not suppress evidence tainted by the Sixth Amendment violation. The analysis of prejudice in the context of determining whether a trial court erred by not dismissing the indictment as a remedy for a Sixth Amendment violation is not the same as a *Chapman* harmless error analysis, in which the State bears the burden of showing that a constitutional error did not contribute to the conviction. Under *Morrison*, if there is no demonstrable or substantial threat of prejudice from the Sixth Amendment violation, there is no error in failing to dismiss the indictment.

Regarding which party must show prejudice to obtain a dismissal of the indictment, the Supreme Court observed in *Morrison* that the defendant had "demonstrated no prejudice." 449 U.S.

15

at 366.  A defendant must show prejudice to secure a dismissal of the indictment.  *See United States v. Davis*, 226 F.3d 346, 353 (5th Cir. 2000) (finding that an indictment cannot be dismissed for a Sixth Amendment violation "without some showing of prejudice" and that there was no error in failing to dismiss the indictment because the defendant did not show prejudice); *United States v. Johnson*, 68 F.3d 899, 902 (5th Cir. 1995) ("a defendant must show prejudice to his ability to receive a fair trial before charges will be dismissed"); *United States v. Laury*, 49 F.3d 145, 150 (5th Cir. 1995) (defendant could not demonstrate prejudice warranting dismissal of the indictment).  These cases suggest that it is the defendant who has the burden to show prejudice that cannot be cured by a less drastic remedy than dismissal.  Accordingly, the state appellate court was not required to presume prejudice, as Petitioner contends.

**C.     Prejudice**

Petitioner argues that he was prejudiced because the prosecutor made 43 pages of notes from the recordings and the recordings included discussions about where witnesses live and attempts to track down their phone numbers, statements that the defense could prove why Petitioner was not wearing shoes on the night of the murder, and Petitioner's statement about the trucks he drove on that night.

The trial court suppressed evidence obtained or derived from the recordings as a remedy for the Sixth Amendment violation.  The prosecutor who took notes and the DA's Office were recused from the case and ordered not to communicate with the special prosecutor about the case.  Petitioner has not shown that the special prosecutor was aware of any of the information contained in the recordings.  He has not shown that the recorded discussions about defense witnesses were used by the State to develop the case against him or to undermine the defense.  The statements that the

defense could prove why Petitioner was not wearing shoes did not provide any details. Although the recordings included Petitioner's statement about the trucks he drove, he also told a television news station information about his movements that evening and about his use of his mother's truck. There was evidence that he returned to college the day after the murders in his mother's truck. Petitioner does not show how his recorded statements about the trucks he drove on the night of the murder adversely affected his defense or benefitted the State. He has not shown that the state court unreasonably determined that he had not shown prejudice sufficient to warrant dismissal of the indictment. He therefore entitled to no relief on this claim.

### IV. WORK PRODUCT

Petitioner contends that the state court did not permit defense counsel to cross-examine the prosecutor who listened to the recordings or require her to produce the notes she took about the recordings based on the work product privilege. *See Woodruff*, 330 S.W.3d at 726-29; *see also Cameron v. State*, 241 S.W.3d 15, 19 (Tex. Crim. App. 2007) (work product privilege of Tex. R. Evid. 503(b)(2) applies in criminal cases). He argues that the state appellate court erred in finding that the crime-fraud exception to the privilege (Tex. R. Evid. 503(d)(2)) did not apply because the Sixth Amendment violations did not constitute a crime, and that he did not show a substantial need to produce the testimony or notes.

In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States. *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991). The correctness of the state court's interpretation of state law is beyond the scope of federal habeas review. *Young v. Dretke*, 356 F.3d 616, 628 (5th Cir. 2004); *Creel v. Johnson*, 162 F.3d 385, 395 (5th Cir. 1998); *Weeks v. Scott*, 55 F.3d 1059, 1063 (5th Cir. 1995). The state court's

17

application of state evidentiary rules is not reviewable.

Petitioner suggests that a state court's erroneous application of its work product privilege can invoke the right to due process. He does not, however, argue or explain how his due process rights were violated. Notably, he did not raise due process in his petition for discretionary review. (*See* doc. 12-21 at 20-23.) To the extent he seeks to raise a due process claim regarding the work product privilege, his claim is unexhausted. A petitioner must fully exhaust state remedies before seeking federal habeas relief. 28 U.S.C. § 2254(b). To exhaust under § 2254, he must fairly present the factual and legal basis of any claim to the highest available state court for review prior to raising it in federal court. *See Deters v. Collins*, 985 F.2d 789, 795 (5th Cir. 1993); *Richardson v. Procunier*, 762 F.2d 429, 432 (5th Cir. 1985); *Carter v. Estelle*, 677 F.2d 427, 443 (5th Cir. 1982).

Moreover, Petitioner has not shown how he was harmed. As discussed, the prosecutor who took notes and the DA's Office were recused from the case and were ordered not to communicate with the special prosecutor about the case. Petitioner has not shown that the special prosecutor was aware of any of the information contained in the recordings. He has not shown that this claim entitles him to relief.

## V.  EVIDENTIARY HEARING

Upon review of the pleadings and the proceedings held in state court as reflected in the state court records, an evidentiary hearing appears unnecessary. Petitioner has not shown he is entitled to an evidentiary hearing.

## VI.  RECOMMENDATION

The petition for habeas corpus relief under 28 U.S.C. § 2254 should be **DENIED** with prejudice.

18

**SO RECOMMENDED** this 16th day of May, 2017.

_____
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

### INSTRUCTIONS FOR SERVICE AND
### NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

_____
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE